IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

POLARIS INDUSTRIES INC.,

Civil No. 10-CV-4362 (JNE/AJB)

Plaintiff,

v.

CFMOTO POWERSPORTS, INC.; CFMOTO
AMERICA INC.; JOHN T. & ANGELA M.
O'MARA D/B/A QUAD CENTRAL
MOTORSPORTS; AND LEO'S KAWASAKI
SALES SOUTH INC.,

Defendants.

**DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF
MOTION TO STAY PATENT
INFRINGEMENT COUNT AND
DISMISS REMAINING COUNTS
FOR FAILURE TO STATE A
CLAIM UNDER
RULE 12(b)(6)**

## INTRODUCTION

Defendants CFMOTO Powersports, Inc., CFMOTO America Inc., John T. &

Angela M. O'mara D/B/A Quad Central Motorsports, and Leo's Kawasaki Sales South

Inc., (collectively referred to as "Defendants") move the Court for an order staying this

action in part and dismissing the remainder of the action with prejudice.  Defendants ask

the Court to stay this action as to Count I of Plaintiff's Complaint for Patent

Infringement.  Defendants are in the process of seeking a reexamination by the United

States Patent and Trademark Office as to the validity of the patent at issue.  Defendants

also ask the Court to dismiss the remaining Counts in Plaintiff's Complaint under the

Federal Rules of Civil Procedure, Rule 12(b)(6) for failure to state a claim upon which

relief can be granted.  Plaintiff has failed to properly plead and allege facts specific and sufficient enough to satisfy the requisite elements of its legal theories under Counts II –V of the Complaint.

## STATEMENT OF FACTS

CFMOTO America, Inc., is a New Jersey Corporation, that was organized in 2006 for the purposes of applying for United States Environmental Protection Agency ("USEPA") certifications in anticipation of import of Chinese manufactured vehicles into the United States.  CFMOTO Powersports Inc. (hereinafter "CFMOTO"), was organized in April of 2007, and the company became a successor in interest and assignee of CFMOTO America Inc., which in turn became a dormant entity.   CFMOTO began to establish market presence in the United States in late 2007.

CFMOTO is presently in the business of importing and distributing unique motorcycles with automatic transmissions, scooters, all terrain vehicles ("ATVs") and similar motor vehicles into the United States and then selling those vehicles to the public through a network of dealers.   CFMOTO, at present, employs approximately 15 individuals and operates principally out of its Plymouth, Minnesota warehouse location. CFMOTO currently has a network of dealers for its products located throughout thirty seven states.

The vehicles CFMOTO imports are manufactured by Chunfeng Holding Group Hangzhou Motorcycles Manufacturing Co., Ltd., k/n/a Zhejiang CFMOTO Power Co.

Ltd. (hereinafter "CFP"), located in China.  CFP is situated in Hangzhou, about 100 miles from Shanghai.  CFP specializes in developing, manufacturing and marketing liquid-cooled engines ranging from 125CC to 800CC.    With 20 years experience in the industry, CFP's high-end products lead the power sports industry in China.   CFP has an annual production capacity of 800,000 liquid-cooled engines and 600,000 vehicles.   CFP supports a global distribution network of dealerships throughout Europe, North America, South America, Australia, New Zealand, Africa and China.

CFP's CFMOTO brand has been recognized globally for its innovation and differentiation.   The core competitiveness of CFP lies in its consistent independent innovation over the past 20 years.   CFP employees over 200 individuals in its research and development group which amounts to approximately 20% of its total workforce. CFP has developed over 12 models of vehicles and 5 different and unique liquid-cooled engine families, which are manufactured in a variety of displacement categories.   CFP vehicles and engine families are certified by USEPA and the US Department of Transportation, as well as by the International Organization of Standardization ("ISO") and as being in conformance with European Standards ("EEC").

Given the fact the U.S. is the largest market in the world for off-road vehicles; CFP has recently developed several ATV and utility terrain vehicle ("UTV") models for sale in the U.S.   Approximately four years ago, CFP began the development of a new sporty side by side ATV similar to its Rancher (CF 500-3) model.   The result of the development was the introduction of the "Z5/Z6" product line or what is now known in the U.S. as the "Terracross 600."

On February 4, 2009, counsel for Polaris Industries Inc. ("Polaris"), contacted CFP to place CFP on notice of an alleged design patent infringement.  Polaris stated that it created the RANGER RZR ATV ("RZR") and put it into market in 2008.   Polaris claimed that it received a design patent in 2007 (U.S. Pat. No. 555,036) for the RZR and that the new CFMOTO ATV (then known as the Z5), which was exhibited in Poland, was believed to be in violation of said patent.  Counsel for Polaris also noted the existence of utility patent applications and requested an investigation by CFP and a "prompt" response to the Polaris allegations.  *Please See February 4, 2009, Polaris Correspondence, attached as Exhibit "A" to the Affidavit of Boris Parker, filed herewith.*

On February 18, 2009, Allbright Law Offices ("Allbright"), representing CFP and located in China, responded to the earlier correspondence from counsel for Polaris. Allbright indicated to counsel for Polaris that the ATV mentioned in his letter was developed and designed independently by CFP, that the Z5 demonstrated in Poland was not the final product and that no production or sales had taken place.  CFP agreed to consider the patent and applications provided by Polaris and invited Polaris to visit CFP's factory for purposes of mutual cooperation and avoidance of any "possible infringement." CFP concluded by denying any infringement and indicated its willingness to work with Polaris to avoid any legal disputes in this regard.  *Please See February 18, 2009, CFP Correspondence, attached as Exhibit "B" to the Affidavit of Boris Parker, filed herewith.*

In April 2009, CFP approached the Morgan Lewis & Bockius, LLP ("Morgan Lewis"), a large U.S. law firm (1300 attorneys) principally located in Washington, D.C., with offices in Beijing, China, and requested a "non-infringement" analysis of the Polaris

design patent and an "invalidity" analysis of the two pending utility patent applications filed by Polaris.

On April 30, 2009, Morgan Lewis issued its non-infringement analysis report to on U.S. Design Patent No. D555,036 to CFP.  The report concluded that CFP was not infringing on the Polaris design patent with its Z5/Z6 model and Morgan Lewis cleared the way for CFP to file its own design patent application for the Z5/Z6 internationally and with the USPTO.   CFP filed its design patent application with the United States Patent and Trademark Office ("USPTO") in the fall of 2009 and received a U.S. Patent No. D622,631 on the design of the Z5/Z6 ATV model.  *Please See CFP Design Patent, attached as Exhibit "C" to the Affidavit of Boris Parker, filed herewith.*

In early September, 2009, Morgan Lewis issued its invalidity analysis report on the Polaris utility patent applications No. 11/494,890 and 11/494,891.  Morgan Lewis concluded that the USPTO should not grant an issuance to the two applications because the pending claims contained in the applications were anticipated or would be rendered obvious by the prior art references under 35 U.S.C. 102 or 103, and even if the application claims were ever allowed <u>as is</u> by the USPTO, a court and/or jury should find that they are invalid in light of prior art references.

On September 15, 2009, the USPTO issued an Office Action on application No. 11/494,891 (which ultimately matured into the patent-in-suit) rejecting all the claims over the prior art, including five separate rejections of claim 1 as anticipated or obvious each by a single reference.  Of relevance to the subsequently allowed claims and the request for reexamination filed by CFMOTO, included among these rejections was a rejection of

claim 1 as obvious over U.S. Pat. No. 7,510,199 to Nash ("Nash"), and a rejection of claims 1 and 16 as anticipated by U.S. Pat. No. 7,168,516 to Nozaki ("Nozaki").

On or about December 15, 2009, Polaris responded to these rejections by amending claim 1 to include the limitation of the engine and the transmission located longitudinally behind the pair of laterally spaced-apart seating surfaces.   In arguing over Nash, Polaris stated that Nash et al. shows a utility vehicle of the four wheel drive type having a bench seat with the engine and transmission positioned under the seat.   Polaris claimed that it developed a totally redesigned vehicle of the sportive nature with a lower center of gravity and a reduced width.   Polaris claimed to have positioned the engine and transmission longitudinally behind the pair of laterally spaced apart seating surfaces. Counsel for Polaris contested that nothing in Nash et al. showed such a design.

In fact, the statements from Polaris to the USPTO about Nash were blatantly false. Nash shows an all terrain vehicle having two bucket seats, which is known in the art as a "side-by-side" ATV.   Further, Nash shows an all terrain vehicle with the transmission positioned between the seats and the engine positioned behind the seats.   Nash expressly states that the engine is positioned generally rearward of, and lower than, the seating area.

On December 31, 2009, counsel for Polaris sent another letter to CFP and Allbright in regard to the exhibition by CFP of its Z6 ATV model at the Milan, Italy, trade show.  Counsel for Polaris again alleged potential infringement of the Polaris design patent for the RZR and asked CFP to evaluate the Z6 against the design patent and to respond accordingly.   *Please See December 31, 2009, Polaris Correspondence, attached as Exhibit "D" to the Affidavit of Boris Parker, filed herewith.*

On January 27, 2010, Allbright provided a formal reply to the patent infringement allegations from Polaris.  Allbright disclosed to counsel for Polaris the analysis and non-infringement opinion of Morgan Lewis in regard to the design patent and the invalidity opinion as to the two pending utility applications.   Allbright invited Polaris again to negotiate in good faith in an attempt to avoid a legal dispute.  *Please See January 27, 2010, CFP Correspondence, attached as Exhibit "E" to the Affidavit of Boris Parker, filed herewith.*

On February 15, 2010, after the Minneapolis International Motorcycle Show ("IMS"), Polaris sent notice to CFMOTO Powersports, Inc., alleging infringement by the Z6 ATV model.  At this time the utility applications were still pending for Polaris and the only patent that could have been infringed upon by CFP or CFMOTO was related solely to design, which is not at issue in this case.  *Please See February 15, 2010, Polaris Correspondence, attached as Exhibit "F" to the Affidavit of Boris Parker, filed herewith.*

In the meantime during February and March of 2010, Polaris and CFP were in discussions for a product and market development partnership in China.  The parties were ready to enter into a confidential disclosure agreement to provide proprietary information to the other for the purpose of the parties evaluating a transaction pursuant to which CFP would manufacture vehicle engines and engine part for Polaris.  *Please See March 15, 2010, Unexecuted CDA between Polaris and CFP, attached as Exhibit "G" to the Affidavit of Boris Parker, filed herewith.*

On March 26, 2010, the undersigned counsel, after several conversations with counsel for Polaris, Eric Groen, wrote the following:

As I mentioned to you by telephone our law firm represents the interests of CFMOTO Powersports Inc. ("CFMOTO"), and ChunFeng Holding Group, LTD ("CHG") on various matters in the United States.  We have been asked to take over the matters raised in your correspondence to our clients on the issue of the Polaris design patent and other pending applications.  It has taking me a little time to get my hands around the issues raised in your letters, but I have achieved a certain level of clarity and can respond appropriately to your concerns.

… It is my understanding that AllBright Law Offices, being unaware of U.S. evidentiary laws and rules of privilege, may have provided to you certain attorney client communications that it received as counsel for CHG from the law firm of Jackson Lewis [sic, Morgan Lewis] in Washington, D.C… Any copies made of said documents in the possession of your firm, Polaris or any third parties need to be immediately destroyed.  Please let me know as soon as possible what attorney client materials are in your possession…

As it pertains to the Polaris design patent, you letters seem to reach a rather abrupt legal conclusion on infringement without any factual substantiation. I don't see any ornamental similarity between the vehicle designed by Polaris and that of the vehicle designed by CHG. Consequently, in order for me to have any meaningful discussions with our clients, it is imperative that you set out the exact criteria and aspects of similarity between the two respective vehicles. The attorney from Allbright has previously indicated to you that CHG has patent claims of its own with respect to the Z5/Z6 series that are wholly independent of Polaris. As a result, factual specificity behind your allegations is necessary for any further actions on our end in regard to the Polaris design patent.

Finally, on the issue of the two pending Polaris applications, thank you for calling these applications to our attention. However, you have thus far entirely failed to demonstrate that the applications pertain to anything patentable over the prior art.  Current prosecution history suggests that at best you have an uphill battle with at least one of the applications. Therefore, if you want to have a meaningful discussion on possible future ramifications of certain claims that you feel have a solid footing for allowance and overlap with designs or processes of CFG, then feel free to contact me and identify those claims, and we can take a closer look.

Please address the privileged communications issue as soon as possible and let me know how you would like to proceed on the asserted

infringement matters. All rights and remedies remain reserved by our clients.

*Please See March 26, 2010, CFP Correspondence, attached as Exhibit "H" to the Affidavit of Boris Parker, filed herewith.*   CFP did not receive any response from Polaris's counsel to the March 26, 2010 correspondence.  Despite CFP's counsel attempts to contact Eric Groen in regard to the attorney client privilege issue, no response was provided.

Since the commencement of this litigation, Defendants have learned that after receiving notice from CFP of the Morgan Lewis invalidity opinions regarding the utility patent applications, counsel for Polaris filed an amendment on March 18, 2010, which added wholly new claims 45-63.  Subtly, these new claims did not require the engine and transmission to be longitudinally behind the pair of laterally spaced apart seating surfaces, but rather only required "the engine positioned rearwardly of the seating area". That is, new claim 45 required the exact engine position of Nash, which Polaris had just gotten done falsely stating was absent from Nash.  Claim 46 depended from claim 45, and further required bucket seats.  That is, new claim 46 required the exact seating arrangement disclosed in Nash, which Polaris had just gotten done falsely stating was absent from Nash.  Claim 47 depended from claim 46, and further required a low point of the seating surface below the top of the engine, which is also the exact elevation of the engine in Nash.

At the same time, crossing in the mail, the Patent Office issued a Final Rejection on March 24, 2010 of all the utility patent application claims pending prior to the March

18, 2010 Amendment.    The rejection confirmed the Morgan Lewis invalidity opinion issued in September, 2009, to CFP.

When the Examiner realized that the March 18, 2010 Amendment had crossed in the mail with the March 24, 2010 Final Rejection, the Examiner again took up the case to consider the newly added claims 45-63.   While maintaining the rejection of all the prior claims, the Supplement Final Rejection of April 14, 2010 indicated allowability of claim 47 and all claims dependent thereon.    Apparently the Examiner accepted Polaris' argument that Nash discloses a bench seat vehicle with the engine under the seat, without further looking at or verifying the structure actually disclosed in Nash.   No statement about the reasons for patentability of claim 47, and particularly no statement of the reasons for patentability of claim 47 over Nash, was given.   Polaris quickly latched onto this error by the Examiner.   On May 3, 2010, Polaris canceled all the earlier claims 1-30 and 38-44, and amended claim 45 to include the limitations of claims 46 and 47.

On May 18, 2010, the Examiner issued a new rejection of claims 45, 48-57, 59 and 60 based upon a newly discovered reference to Vittone, U.S. Pat. No. 3,366,411 (1968) ("Vittone") in view of Kato et al. U.S. Pat. Pub. 2004/0195034 ("Kato"). However, the May 18, 2010 Office Action indicated that claims 61-63 were considered patentable over the Vittone/Kato combination.   The May 18, 2010 rejection never considered or discussed the location of the engine in Kato/Nash.   The May 18, 2010 rejection never considered or discussed the location of the fuel tank in Kato.   The May 18, 2010 rejection never considered or discussed the location of the fuel tank in the numerous other ATV references which disclose the fuel tank positioned below one of the

seating surfaces – including Nozaki, Furuhashi, Bataille and Mizuno, relative to claim 61. The May 18, 2010 rejection provided no statement of reasons for allowance of claim 61. There simply is nothing patentable or original in the ATV art about positioning a fuel tank below one of the seating surfaces.

Again seizing on the oversight of the Office Action, Polaris on June 9, 2010 promptly amended claim 45 to include the limitations of claims 59, 60 and 61, without discussion. A Notice of Allowance issued on June 28, 2010, leading to the patent-in-suit, U.S. Pat. No. 7,819,220 ("'220 patent"). None of the claims to the originally claimed invention in the utility patent application, an ATV narrow enough to fit on trails of a width of less than 54 inches, survived in the issued '220 patent.

On October 26, 2010, the day the '220 patent issued, Polaris filed this lawsuit. The complaint in this lawsuit is totally silent with respect to U.S. Pat. No. D555,036, the design patent that Polaris originally alleged was infringed. The '220 Patent involved in this lawsuit contains none of the claims that existed when Polaris brought its patent applications to CFP's attention in the previous two years. CFP never received any notice with respect to the amended aspects of the issued patent.

On December 1, 2010, CFMOTO filed a Request for Inter Partes Reexamination ("Request for Reexamination") of the Polaris patent at issue in this suit. A corrected Request for Reexamination was filed on December 17, 2010 at the request for of the USPTO to restate the proposed rejections separately. *Please See CFP Request for Reexamination, attached as Exhibit "I" to the Affidavit of Boris Parker, filed herewith.*

The Request for Reexamination is currently under consideration for acceptance by the USPTO.

The crux of the request for reexamination is that the claimed invention is neither novel nor non-obvious. Most of the claim limitations of the '220 patent are merely a laundry list of parts found in a side-by-side four wheel drive all-terrain vehicles. The concept of four wheel drive, all terrain vehicles with side-by-side seating is of course decades old – Dodge started building 4x4 trucks in the 1930s. The '220 patent requires the engine to be behind the seating area, which makes it different than most four wheel drive vehicles, but this concept, too, was well within the prior art.

The only reason the '220 patent issued was due to Polaris's false statements about another one of the applications incorporated by reference in Kato, that of Nash, because the Examiner was misled by Polaris's "engine and transmission behind the seating area" arguments (misled due to the fact that such arguments are not consonant with the claim language allowed, which is silent on the location of the transmission relative to the seating area) and/or because the Examiner did not apply the allowed claim language to Kato's disclosure.

The full application of the prior art to the claim language, on a claim by claim and limitation by limitation basis, is included in the claim chart contained the Request for Reexamination (Exhibit "I"). As presented to the USPTO, consideration of the teachings of prior art as a primary reference, alone or in combination with the secondary references discussed in the Request for Reexamination, presents substantial new questions of patentability.

## **LEGAL ARGUMENT AND AUTHORITIES**

I.   **MOTION TO STAY AND MOTION TO DISMISS STANDARD OF REVIEW**

The factors a court considers when evaluating a motion to stay are set forth below in the next section of this memorandum.  As it pertains to a Rule 12(b)(6) motion under of the Federal Rules of Civil Procedure, a Defendant may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  Dismissal is proper where the Plaintiff's complaint fails to state a claim upon which relief can be granted.  At this stage of the litigation, the court accepts as true all of the factual allegations contained in the complaint, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief.  The Plaintiff must include sufficient factual information to provide the "grounds" on which the claim rests, and to raise a right to relief above a speculative level.  Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir.2008).  "A motion to dismiss should be granted if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief."  Students for Sensible Drug Policy Found. v. Spellings, 523 F.3d 896, 899 (8th Cir.2008).

A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Moreover, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S.Ct. 1955 (2007).  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.  Id.  This Twombly standard applies to all civil actions.


## II.     THIS LITIGATION SHOULD BE STAYED PENDING REEXAMINATION OF UNDERLYING PATENT BY THE USPTO

A defendant in a patent infringement suit who files a reexamination request may seek a stay in court of the infringement trial, so long as the court is satisfied that the request has not been made only for purposes of delay.   Raytek, Inc. v. Solfan Systems, Inc., 211 U.S.P.Q. (BNA) 405, 1981 WL 40550 (N.D. Cal. 1981); Ingro v. Tyco Industries, Inc., 227 U.S.P.Q. (BNA) 69, 1985 WL 1649 (N.D. Ill. 1985); Loffland Bros. Co. v. Mid-Western Energy Corp., 225 U.S.P.Q. (BNA) 886, 1985 WL 1483 (W.D. Okla. 1985).  In many instances it is appropriate for a district court to stay a patent case pending the outcome of a USPTO proceeding.  Procter & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842 (Fed.Cir.  2008).

Once an order for inter partes reexamination of a patent has been issued under section 313, *the patent owner* may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent which are the subject of the inter partes reexamination order, unless the court before which such litigation is pending determines that a stay would not serve the interests of justice.  35 U.S.C. § 318.

The Supreme Court has long recognized that district courts have broad discretion to manage their dockets, including the power to grant a stay of proceedings. See, e.g., Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S.Ct. 163, 81 L.Ed. 153 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of causes on its docket.... How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").   The decision of whether to grant a stay pending reexamination of a patent is within the district court's discretion. Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001).  In exercising this discretion, the Court must weigh the competing interests of the parties and attempt to maintain an even balance.

When considering whether to stay patent infringement litigation pending a reexamination of the patent in suit, courts generally examine three factors, including (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.  See, 3M Innovative Properties Co. v. Dupont Dow Elastomers LLC, No. 03 ‐ 3364 MJD/AJB, 2005 WL 2216317, at 1 (D. Minn. 2005) (Davis, C.J.), quoting Xerox Corp. v. 3Com Corp., 69 F.Supp.2d 404, 406-07 (W.D.N.Y. 1999); Accord Time Warner Cable, Inc. v. USA Video Tech. Corp., 520 F.Supp.2d 579, 582 (D.Del. 2007); Medicis Pharmaceutical Corp. v. Upsher-Smith Laboratories, Inc., 486 F.Supp.2d 990, 993-94 (D.Ariz. 2007); Telemac Corp. v. Teledigital, Inc., 450 F.Supp.2d 1107, 1111 (N.D.Cal. 2006); Gonnocci Revocable Living Trust v. Three M Tool & Mach., Inc., 68 U.S.P.Q.2d 1755, 1757

(E.D.Mich. 2003).  Many courts have recognized that "there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination ... proceedings." See, e.g., <u>Medicis Pharmaceutical Corp.</u>, 486 F.Supp.2d at 993 (internal quotation omitted).

### A.       Stay Is Warranted In The Case At Bar

### 1. Prejudice to Plaintiff

The prejudice factor weighs in favor of stay.  The reexamination process is somewhat lengthy; with current inter partes reexamination pendencies averaging about 36 months.  *Please See Inter Partes Reexamination Filing Data, attached as Exhibit "J" to the Affidavit of Boris Parker, filed herewith.*  The issue for the Court is whether Plaintiff will be *unduly* prejudiced, and Plaintiff can offer little to demonstrate prejudice beyond the inevitable delay.  Plaintiff cannot claim that it may be driven out of business or that its business will be adversely affected at all, if this action is stayed.  There is nothing to suggest that Plaintiff will suffer an undue burden.  Defendants have made minimal sales of the Z6 model to date (less than 100 units) and CFMOTO's ATV market share as a whole in the U.S. currently is substantially less than 1%.  Consequently, any potential prejudice from delay of adjudication to Plaintiff can be easily remunerated by way of financial compensation if indeed Plaintiff ultimately prevails on its underlying infringement claim.   See <u>Perricone v. Unimed Nutritional Svcs., Inc.,</u> 2002 WL 31075868, at 3 (D.Conn. 2002).

The fact that there exist a "substantial new question of patentability" surrounding the '220 Patent weights heavily in favor of stay.   The reexamination should occur in an orderly process and reasonable period of time.  Plaintiff has some degree of control over the length of time involved, as Plaintiff can choose to participate in a USPTO program in which patent owners forego an owner's statement and Plaintiff can choose to respond to inquiries from the USPTO promptly.

Delay due to the reexamination process is <u>not</u> itself a reason to find prejudice against Plaintiff sufficient to prevent a stay.  See <u>Allied Erecting and Dismantling Co., Inc., v. Genesis Equip. and Mfrg., Inc.</u>, 2010 WL 3239001, at 1 (N.D.Ohio Aug. 16, 2010) ("While some prejudice to Plaintiffs is inherent in any delay, this alone is not sufficient to prevent a stay.  If it were, few if any patent cases would be stayed pending reexamination by the USPTO.").  Defendants cannot ask the USPTO to reexamine a patent prior to its issuance, and CFMOTO filed the reexamination request a little more than a month after the '220 patent issued.    Litigation itself is typically lengthy and involves unforeseen delays.  Additionally, the reexamination may streamline the issues to an extent that the litigation itself is shortened.  Accordingly, the lack of undue prejudice to Plaintiff weighs in favor of granting a stay.

### 2. Simplification of the Issues

The simplification factor weighs heavily in favor of a stay.   The USPTO reexamination will simplify the issues in this case by focusing discovery, narrowing the issues for trial, and potentially promoting settlement.  See <u>Sulzer Inc. v. Black Clawson Co.</u>, 1995 WL 363440, at 1 (S.D.N.Y. 1995).  The USPTO has particular expertise in

evaluating patentability, and its reexamination will help the Court understand the issues and will reduce the length and complexity of this litigation regardless of whether the USPTO invalidates some or all of Plaintiff's claims.  "A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings."  35 U.S.C. 315(c).  Thus, staying the case pending inter partes reexamination will reduce the grounds of invalidity which could be argued before the Court.  The Court and the parties will also benefit from the USPTO's reexamination record when it is time to litigate grounds of patentability which cannot be considered in the inter partes reexamination rules.

Even if claim language is the only change initiated by the USPTO, a stay would still be beneficial because the parties would not waste resources and the Court's time on claim language that ends up being moot.   Similarly, even if the patent emerges unchanged from the reexamination, the litigation would be streamlined by eliminating issues of validity that the Court would otherwise need to determine.

The reexamination data from the USPTO shows that since the inception of *inter partes* reexaminations, over 96% of requests for *inter partes* reexaminations have been granted.  Thus, it is likely the USPTO will grant Defendants' request for reexamination.  Further, 89% of all patents which have been reexamined since 1999 have either had all

claims canceled or changes made to the claims.   *Please See Inter Partes Reexamination Filing Data, attached as Exhibit "J" to the Affidavit of Boris Parker, and filed herewith.*

Thus, it is also likely at least some of the patent's claims will be changed upon reexamination.   If claims are canceled or changed, it would simplify the issues pertaining to Defendants' arguments on invalidity based on prior art.   Even if all the claims are confirmed by the USPTO, the record of reexamination is still likely to be entered at trial, reducing the length and complexity of the litigation.  See Nidec Corp. v. LG Innotek Co., Ltd., 2009 WL 3673433, at 2 (E.D.Tex. 2009).   Granting a stay will avoid duplication of efforts by the Court should the claim language be changed.   It is undisputed that a stay would promote judicial economy and conserve the parties' resources.

### 3.  Stage of the Proceedings

The early stage of this proceeding weighs in favor of a stay.   No scheduling order has issued and no discovery has yet taken place.   See Gaymar Industries, Inc. v. Cincinnati Sub-Zero Prods., Inc., 2009 WL 3162213, at 4 (W.D.N.Y. 2009) (stay appropriate in "infant" stage of case).   Cases are "routinely stayed in the absence of substantial progress toward trial." Id.   Here, the parties have not made any progress toward trial. Staying the case avoids the risk that substantial litigation efforts by the parties and the Court will have been wasted if/when the USPTO concludes that Plaintiff's patent is invalid.

Because the litigation has just begun, this factor weighs heavily in favor of granting a stay, even prior to the USPTO issuing its decision on whether to grant Defendants' reexamination request.   While the USPTO has not yet granted Defendants'

request for reexamination, Defendants believe that the USPTO is quite likely to decide whether to reexamine the patent by February 24, 2011.   Because the case is at such an early stage, a stay of the entire case, including discovery and claim construction, is appropriate.

Accordingly, given that there is no undue prejudice to Plaintiff, that the reexamination will likely simplify the issues for litigation, and that the case is at a very early stage, the Court should grant Defendants' motion for stay.

## III.   PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF FOR UNFAIR COMPETITION UNDER THE LANHAM ACT

Plaintiff has alleged under Count II of its compliant that Defendants have been selling and advertising side by side ATV's that "have a shape and look confusingly similar to the protectable aspects of the appearance of the Polaris's side by side all terrain vehicles."  Complaint, paragraph 23.   Polaris alleges further that such activity is unfair competition in violation of the Lanham Act, 15 U.S.C. §§1051-1127.  Id.  Polaris fails to specify which particular section of the Lanham Act is being violated.  However, the only unfair completion protection that Polaris can assert under the Lanham Act based on the factual allegations in the complaint relates to trade dress.

Section 43(a) of the Lanham Act protects trade dress. "A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers." Nora Beverages, Inc. v. Perrier Group of America, Inc., 269 F.3d 114, 119 (2d Cir.2001). A product's trade dress is protected under the Lanham Act if it is not

functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace.  Id.   With respect to trade dress claims premised on a particular product design (as opposed to, for example, product packaging), as in this case, the Plaintiff must show that the product design trade dress has acquired secondary meaning in the marketplace.   See Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir.2001) (citing Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 213-17, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)( "[I]n an action for infringement of unregistered trade dress under §43(a) of the Lanham Act, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning.").

Plaintiff has alleged no facts directed at the crucial element of secondary meaning. The closest factual allegation is the allegation in paragraph 12 of the complaint, that an industry commentator stated, "Z6 bears a striking resemblance to the very hot Polaris RZR".   This statement from an industry commentator does not speak to the required element of secondary meaning.

A product has acquired secondary meaning when, "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." Id. (quoting Samara Bros., 529 U.S. at 210-11, 120 S.Ct. 1339).   A product gains secondary meaning from great public recognition through long use and exposure in the marketplace.   For example, the golden arches have become so well known throughout the years that a consumer instantly recognizes the trademark mark as representing McDonalds.

Plaintiff has alleged no facts in support of secondary meaning. The fact Plaintiff has alleged, that Polaris "jumped ahead of the industry in 2008" is the antithesis of secondary meaning. Any newly designed product is perceived by the public as the product itself, not as designating the source of the product. "Consumers are aware of the reality that, almost invariably, even the most unusual of product designs--such as a cocktail shaker shaped like a penguin--is intended not to identify the source" of the product, "but to render the product itself more useful or more appealing," Samara Bros., 529 U.S. at 213. Any ornamental feature that "the industry" follows (as alleged by Polaris) does not designate the source of the product in the industry. The RZR has only been in production since 2008 and there is nothing in the complaint to even suggest that it has ornamental design features which are the subject of great public recognition through long use and exposure in the marketplace. The bottom line is that the requisite element establishing "secondary meaning" has not been pled. Having alleged no facts in support of secondary meaning, Count II should be dismissed for failure to state a claim.

In addition, Plaintiff must articulate the design elements that compose the trade dress. Yurman Design, 262 F.3d at 116. Thus, the focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Id. (quoting Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir.1997)). Courts are not able to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Id. Polaris cannot claim the entire RZR vehicle as the mark entitled to protection, which is what it is basically doing in its complaint.

In the case at bar Plaintiff has not pled the necessary elements establishing a Lanham Act unfair competition claim.  Plaintiff has failed to state which part of its non functional trade dress is entitled to protection.  Plaintiff only makes general references to trade dress and design and there can be no dispute that Plaintiff has failed to identify any specific elements which comprise its distinct dress.  No specific facts setting forth consumer confusion or deception have been presented.  The entirety of Plaintiffs allegation in Count II is nothing more than legal conclusions.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

Finally, the USPTO has already in large part resolved Plaintiff's argument against it, by granting a design patent to CFP.  In doing so, the USPTO has determined that the RZR and Z6 side-by-side ATV's are sufficiently distinct from one another to qualify for independent patent protection as to their respective individual designs, i.e., that the Z6 is a non-obvious design even if a worker skilled in the art had the Polaris design to work from.  The non-obviousness standard applied by USPTO more than establishes that the RZR and Z6 are separate and distinct in the eyes of the consumer.

Plaintiff has simply failed to allege sufficient and distinct facts to satisfy the elements for stating a claim for unfair competition under the Lanham Act.  As a direct and proximate result of Plaintiff's failure to state a proper claim under the Lanham Act, Count II of the Complaint should be dismissed with prejudice.

## IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF UNDER ITS STATE LAW CLAIMS

### A.   Deceptive Trade Practices Under M.S.A §325D.44

Claims for deceptive trade practices under the Minnesota Deceptive Trade Practices Act ("MDTPA") are analyzed under the same rubric as claims under the federal Lanham Act.   Aviaton Charter, Inc. v. Aviation Research Group/US, 2004 WL 1638176, at 5 (D.Minn. 2004) (unpublished), aff'd 416 F.3d 864 (8th Cir.2005).   See also The Sales Board v. Pfizer, Inc., 644 F.Supp.2d 1127 (D. Minn. 2009)(Holding that Sales Board's state-law claims for unfair competition and trademark infringement should be analyzed under the same standard as the Lanham Act claims and the Court therefore analyzes Sales Board's state-law and Lanham Act claims under the Lanham Act standard); See also, DaimlerChrysler AG v. Bloom, 315 F.3d 932, 936 n.3 (8th Cir. 2003) ("The district court concluded, and the parties appear to concede, that the state law claims are coextensive with the federal claims. As such, we do not discuss them independently.").

In addition, any claims directed at alleged misrepresentations under Minn. Stat. § 325D.44 must be pled with specificity.   Masterson Personnel, Inc. v. The McClatchy Co., 2005 WL 3132349, at 5 (D.Minn. 2005) (unpublished).   The specificity requirement is analogous to the Fed.R.Civ.Pro. Rule 8 requirement for pleading fraud.   In order to meet this pleading requirement, a plaintiff must allege the "who, what, when, where and how" for each fraud claim.   Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir.1997) (citation omitted).

24

The totality of Plaintiff's allegations under §325D.44 in Count III of its Complaint are that "Defendants' use of a side-by-side all terrain vehicle design that is confusingly similar to Polaris' design is likely to cause confusion, mistake, or deception as to the source and origin of the goods and services offered by Defendants."  This statement is nothing more than a legal conclusion and fails to meet the specific requirements of this Circuit and this Court.  This Court in Embroidery Library, Inc. v. Sublime Stitching, LLC, 2010 WL 330321 (D.Minn. 2010), held that "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Quoting, Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  As was the case with the Lanham Act claim discussed above, Plaintiff has simply failed to allege sufficient and distinct facts to satisfy the elements for stating a claim under Minn. Stat. § 325D.44.  As a direct and proximate result of Plaintiff's failure to state a proper claim under Minn. Stat. § 325D.44, Count III of the Complaint should be dismissed with prejudice.

**B.     Minnesota Unlawful Trade Practices Act**

Plaintiff alleges in Count IV of its Complaint, all be it unclearly, a violation of the Minnesota Unlawful Trade Practices Act ("MUTPA"), Minn. Stat. § 325D.09 et seq. The entirety of Plaintiff's allegation in Count IV of the Complaint is limited to the

statement that "Defendants have engaged in unlawful trade practices in violation of Minn. Stat. § 325D.09 et seq." Again, the allegation is nothing more than a legal conclusion which has no independent or specific factual basis.

MUTPA provides, in part, that:

No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality ... of such merchandise.

Minn. Stat. § 325D.13. The Court uses an analysis substantially similar to that applicable to a misrepresentation claim brought under the Lanham Act, 15 U.S.C. § 1125, to analyze a MUTPA claim. Alternative Pioneering Sys., Inc. v. Direct Innovative Prod., Inc., 822 F.Supp. 1437, 1441 (D.Minn.1993); see also, Cincinnati Sub-Zero Prod., Inc. v. Augustine Medical, Inc., 800 F.Supp. 1549, 1557 (S.D.Ohio 1992) ("The analysis applicable to the parties' claims under Ohio's Deceptive Trade Practices and False Advertising statutes is the same analysis applicable to their claims under the Lanham Act."); and Energy Four, Inc. v. Dornier Medical Sys., Inc., 765 F.Supp. 724, 731 (N.D.Ga.1991) ("The Uniform Deceptive Trade Practices Act involves the same dispositive questions as the Federal Lanham Act.... Thus, the court's analysis under the Lanham Act will dispose of the state law issues.").

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) provides, in part, that:

(a)(1) Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which-
. . . . .

(B) in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

Plaintiff must establish five factors in order to prevail on its claim under MUTPA.

Alternative Pioneering, 822 F.Supp. at 1441. Those factors are:

(1)  Defendant made false statements of fact about its own product;

(2)  Those statements actually deceived or have the tendency to deceive a substantial segment of their audience;

(3)  Such deception is material because it is likely to influence buying decisions;

(4)  Defendant caused its misrepresented goods to enter into interstate commerce; and

(5)  Plaintiff has been or is likely to be injured as the result of the misrepresentations.

See e.g., ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C.Cir.1990);

Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., Inc., 911 F.2d 242,

244 (9th Cir.1990); United States Healthcare v. Blue Cross of Greater Philadelphia, 898

F.2d 914, 923-24 (3d Cir.), cert. denied, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33

(1990).

Applying that standard to the complaint it, the MUTPA claim is without merit.

Plaintiff proffers no evidence of misrepresentations by Defendants.   The only

representation factually referenced in the Complaint is one of an industry commentator,

not of Defendants.   See Complaint, paragraph. 12.   There are no allegations in the

Complaint that Defendants made false statements of fact about the Z5/Z6 for purposes of

entering commerce or that any potential statements actually deceived or have the tendency to deceive a substantial segment of their audience. Finally, there are no allegations of materiality or influence on buying decisions.

The Court should therefore find that Plaintiff has not sustained its pleading burden with respect to the factors or elements of its claim under the MUTPA. As stated above, no actionable misrepresentations for purposes of a claim under MUTPA have been alleged.

Lastly, the Minnesota Supreme Court in WatPro, 491 N.W.2d 1 (1992), drew a sharp distinction between commercial parties and consumers for purposes of qualifying for protection under Minnesota Consumer Fraud Act. See WatPro at 7. See also Ly v. Nystrom, 602 N.W.2d 644, 647 (Minn.Ct.App.1999) (holding that § 325F.69 does not protect merchants). Minn.Stat. § 325D.13, part of the Unlawful Trade Practices Act, is similarly designed to protect consumers and not commercial parties like Polaris. See Minn.Stat. § 325D.09 ("The legislature of the state of Minnesota hereby finds: that the trade practices defined and prohibited by sections 325D.09 to 325D.16 ... mislead consumers as to the quality, ingredients and origin of merchandise purchased...."). Thus, the holdings of WatPro and Nystrom teach that § 325D.13 does not apply to protect Plaintiff in the circumstances of the transactions involved in this case. See, Marvin Lumber and Cedar Co. v. PPG Industries, Inc., 223 F.3d 873, 887-888 (8th Cir.(Minn.) 2000).

As a direct and proximate result of Plaintiff's failure to state a proper claim under Minn. Stat. § 325D.09 et seq., Count IV of the Complaint should be dismissed with prejudice.

### C.        Common Law Unfair Competition

The analysis under the Deceptive Trade Practices Act or Count III of Plaintiffs Complaint applies equally to its Count V common law unfair competition claim. Likelihood of purchase confusion is a similar element of common law unfair competition. See The Minneapple Co. v. Normandin, 338 N.W.2d 18, 22 (1983).

Plaintiff's allegations pursuant to Count V are not clear.  Plaintiff asserts the legal conclusion that Defendants' conduct, without describing what that conduct is, constitutes unfair competition in violation and disregard of Polaris's rights.  Plaintiff does not specify what rights have been violated.  As was the case with the Lanham Act unfair competition claim discussed above, Plaintiff has simply failed to allege sufficient and distinct facts to satisfy the elements for stating a claim under Count V.  As a direct and proximate result of Plaintiff's failure to state a proper claim for common law unfair competition, Count V of the Complaint should be dismissed with prejudice.

## CONCLUSION

Defendants believe that Polaris has asserted its Lanham Act and its state law claims for purposes of increasing CFMOTO's market entry costs, disrupting CFMOTO's

business relations with its dealers and strategic partners and forcing all of the Defendants to incur unnecessary legal expenses.  If Polaris's purposes were truly legitimate and driven by a desire for an economic resolution of a legitimate legal dispute, the specific and sufficient factual basis for Counts II-V would have been set forth in its Complaint.

For all the reasons stated herein, Defendants respectfully request that the Court grant their motion to stay Count I of Plaintiff's complaint and dismiss Counts II-V with prejudice for failing to state a claim upon which relief may be granted.

Respectfully submitted,

DATED:  January 13, 2011                      **PARKER & WENNER, P.A.**


 s/Boris Parker_____
Boris Parker, Reg. No. 291316
Nicholas M. Wenner, Reg. No. 196423
1700 U.S. Bank Plaza
220 South Sixth Street
Minneapolis, MN 55402
(612) 355-2200


**SHEWCHUK IP SERVICES, LLC**


s/Jeffrey D. Shewchuk_____
Jeffrey D. Shewchuk, Reg. No.  223888
3356 Sherman Ct., Ste. 102
Eagan, MN  55121
651-331-9558

Attorneys for Defendants